## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOSEPH FRIEL and STEWART
ABRAMSON, individually and on behalf
of a class of all persons and entities
similarly situated,

             Plaintiffs

vs.

HEADSTART WARRANTY GROUP
LLC
AND
AIM AI LLC d/b/a
SAFEGUARD MY CAR, LLC

             Defendants.

Case No. 24-cv-1866

## FIRST AMENDED CLASS ACTION COMPLAINT

### Preliminary Statement

1.    As the Supreme Court has explained, "Americans passionately disagree about many things. But they are largely united in their disdain for robocalls. The Federal Government receives a staggering number of complaints about robocalls—3.7 million complaints in 2019 alone. The States likewise field a constant barrage of complaints. For nearly 30 years, the people's representatives in Congress have been fighting back. As relevant here, the Telephone Consumer

Protection Act of 1991, known as the TCPA, generally prohibits robocalls to cell phones and home phones." *Barr v. Am. Ass'n of Political Consultants*, 140 S. Ct. 2335, 2343 (2020).

2.      However, the TCPA doesn't only restrict robocalls.

3.      "Telemarketing calls are intrusive. A great many people object to these calls, which interfere with their lives, tie up their phone lines, and cause confusion and disruption on phone records. Faced with growing public criticism of abusive telephone marketing practices, Congress enacted the Telephone Consumer Protection Act of 1991. Pub. L. No. 102-243, 105 Stat. 2394 (1991) (codified at 47 U.S.C. § 227). As Congress explained, the law was a response to Americans 'outraged over the proliferation of intrusive, nuisance calls to their homes from telemarketers' *id.* § 2(6), and sought to strike a balance between '[i]ndividuals' privacy rights, public safety interests, and commercial freedoms' *id.* § 2(9).

4.      "The law opted for a consumer-driven process that would allow objecting individuals to prevent unwanted calls to their homes. The result of the telemarketing regulations was the national Do-Not-Call registry. *See* 47 C.F.R. § 64.1200(c)(2). Within the federal government's web of indecipherable acronyms and byzantine programs, the Do-Not-Call registry stands out as a model of clarity. It means what it says. If a person wishes to no longer receive telephone solicitations, he can add his number to the list. The TCPA then restricts the

telephone solicitations that can be made to that number. *See id.*; 16 C.F.R. § 310.4(b)(iii)(B) ('It is an abusive telemarketing act or practice and a violation of this Rule for a telemarketer to . . . initiat[e] any outbound telephone call to a person when . . . [t]hat person's telephone number is on the "do-not-call" registry, maintained by the Commission.')…Private suits can seek either monetary or injunctive relief. *Id*…This private cause of action is a straightforward provision designed to achieve a straightforward result. Congress enacted the law to protect against invasions of privacy that were harming people.  The law empowers each person to protect his own personal rights. Violations of the law are clear, as is the remedy. Put simply, the TCPA affords relief to those persons who, despite efforts to avoid it, have suffered an intrusion upon their domestic peace." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 649-50 (4th Cir. 2019).

5.     Plaintiffs Joseph Friel and Stewart Abramson ("Plaintiffs") bring this action under the TCPA alleging that  AIM AI LLC d/b/a Safeguard My Car, LLC sent pre-recorded telemarketing calls on behalf of Defendant HeadStart promoting their goods and services, including to calls that were on the National Do Not Call Registry, such as the Plaintiffs. Those calls were made without the call recipient's prior express written consent.

6.     Because the calls were transmitted using technology capable of generating thousands of similar calls per day, Plaintiffs brings this action on behalf

of a proposed nationwide class of other persons who were sent the same illegal telemarketing calls.

7.    A class action is the best means of obtaining redress for the Defendants' illegal telemarketing and is consistent both with the private right of action afforded by the TCPA and the fairness and efficiency goals of Rule 23 of the Federal Rules of Civil Procedure.

## Parties

8.    Plaintiff Joseph Friel is a resident in this District.

9.    Plaintiff Stewart Abramson is also a resident of Pennsylvania.

10.    Defendant AIM AI LLC d/b/a Safeguard My Car, LLC is the company who actually sent the pre-recorded telemarketing calls at issue on behalf of Defendant HeadStart, the service contract company.

11.    Defendant Headstart Warranty Group LLC is a limited liability company that does business in this District.

## Jurisdiction & Venue

12.    The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the Plaintiffs' claims arise under federal law.

13.    This Court has general personal jurisdiction over Defendant HeadStart Warranty Group, LLC because it is registered to do business in Pennsylvania, thereby consenting to the exercise of general personal jurisdiction in Pennsylvania.

14.    This Court has specific personal jurisdiction over Defendant AIM AI LLC d/b/a Safeguard My Car, LLC because it sent calls into this District, including as part of its efforts to further the joint business enterprise in which it was engaged with HeadStart.

15.    Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District, as the automated calls to the Plaintiffs were sent into this state and District.

## The Telephone Consumer Protection Act

16.    In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry.  In so doing, Congress recognized that "[u]nrestricted telemarketing . . . can be an intrusive invasion of privacy [.]" Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227).

The National Do Not Call Registry

17.    The National Do Not Call Registry allows consumers to register their telephone numbers and thereby indicate their desire not to receive telephone solicitations at those numbers.  *See* 47 C.F.R. § 64.1200(c)(2).

18.     A listing on the Registry "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." *Id*.

19.     The TCPA and implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers to the Registry and provides a private right of action against any entity that makes those calls, or "on whose behalf" such calls are promoted.  47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2).

## Factual Allegations

20.     Defendant HeadStart Warranty Group LLC is a seller and guarantor of vehicle service contracts. HeadStart is the guarantor of the vehicle service contracts and is the entity that will purportedly pay a covered repair under the contract.

21.     Defendant HeadStart outsources both the lead generation, intake, and customer service and financing sides of its business. Specifically, HeadStart uses Defendant AIM AI LLC d/b/a Safeguard My Car, LLC to place the illegal calls at issue, which HeadStart pays for. Then, representatives of JEA and other third party customer service companies sell HeadStart's warranty products on the

illegal calls. Finally, all the after-sales service, financing, customer management, and payment processing are all handled by former Defendant Line 5.

22.    To generate business for its vehicle contracts, Defendant AIM AI LLC d/b/a Safeguard My Car, LLC physically placed the illegal calls at issue at the direction of Defendant HeadStart.

23.    To generate business for this joint enterprise, AIM AI LLC d/b/a Safeguard My Car, LLC placed illegal telemarketing calls, some pre-recorded, on HeadStart's behalf and at HeadStart's direction.

24.    Plaintiff Friel's telephone number, (610) XXX-XXX, is a non-commercial telephone number not associated with any business.

25.    Plaintiff Friel's telephone number is used for personal residential purposes.

26.    Plaintiff Friel's telephone number has been listed on the National Do Not Call Registry since 2011.

27.    Plaintiffs have never been customers of any of the Defendants nor asked or inquired to be a customer of any of the Defendants.

28.    Despite that, Plaintiff  Frielreceived at least fourteen telemarketing calls from AIM, sent on behalf of HeadStart, from August 8, 2024 to September 27, 2024, from various caller IDs, including 610-987-7826, 610-424-6854, 267-338-4647, 610-537-7100, 267-329-8297, 610-665-3944, 610-440-0343, 610-898-

3992, 267-947-6287, 267-220-6347, 272-304-2756, 272-301-4734, and 267-703-3851.

29.    The calls all began with a prerecorded message with the same fake typing and office background noise.

30.    The calls all started with the same pre-recorded voices, possibly using an Artificial Intelligence (AI) robot or Mechanical Turk, and began, for example:

> Hey Joseph, my name is Adam calling on behalf of the Vehicle Service Department. How are you doing today?

31.    Defendant AIM uses the fake name "Vehicle Service Department" to obfuscate their identities and themselves as the source of the illegal calls Plaintiffs received.

32.    The Plaintiffs would simply hang up on most of these calls because they were not interested.

33.    However, to identify the identity of the identity of the individuals calling him illegally, and for no other reason, Plaintiff Friel played along during a call he received on 9/27/2024 at 11:37j from the caller ID 267-878-3165.

34.    That call began with the same pre-recorded voice:

> Hey Joseph, my name is Adam calling on behalf of the Vehicle Service Department. How are you doing today?

35.Friel replied, "I'm fine." The call continued:

Well Joseph, the main reason for the call is to see if you still have some type of coverage on your vehicle. I just want to confirm that you still drive a Hyundai. Is that right?
Yes.
And how are you liking it so far?

36.    At the time of the filing of the original complaint, when the 267-898-3165 number is called, the same pre-recorded message played, albeit with slight differences. Accordingly, it is evident that Defendants continued to use pre-recorded messages and voices and such conduct will continue in the absence of an injunction.

37.    The AI/Mechanical Turk, "Adam," continued with a marketing script, and asked the Plaintiff Frielfor the mileage of his car, asked about the car's condition, and then connected the call to a live sales agent, named "Charles Burch."

38.    Unlike the previous AI/Mechanical Turk, Mr. Burch was clearly a human being. He asked the same questions, explained the protection plan and what was included, and also extolled some of the benefits, including hotel reimbursement, a rental car, and oil changes.

39.    Mr. Burch also provided a callback number of 800-853-7773.

40.    Plaintiff Abramson's telephone number, (412) XXX-XXX, is a non-commercial telephone number not associated with any business.

41.    Plaintiff Abramson's telephone number is used for personal residential purposes.

42.    Plaintiff Abramson's telephone number has been listed on the National Do Not Call Registry since he listed it there in June of 2015.

43.    In addition, on August 13, 2024 (and prior to the calls outlined in this Complaint), Plaintiff Abramson wrote to Defendant Headstart and specifically requested that they add his telephone number to their own internal Do Not Call list.

44.    Plaintiff Abramson has never asked or requested to be a customer of any of the Defendants.

45.    Despite that, the Plaintiff Abramson received at least seven telemarketing calls from AIM on behalf of Headstart in October of 2024, including from the caller IDs 626-921-2336 and 864-351-5782.

46.    Four of these calls occurred on October 15, 2024 from the 626-921-2336 caller ID number, including multiple calls while the Plaintiff was on the line.

47.    Three of these calls occurred on October 28, 2024 from the 864-351-5782 caller ID number, including multiple calls while the Plaintiff was on the line.

48.    The calls all began with a message that was prerecorded or that used an artificial voice, that said:

> I'm calling on behalf of the Vehicle Service Department. [and umm,] How are you doing today?

49.     Defendant AIM uses the fake name "Vehicle Service Department" to obfuscate their identities and themselves as the source of the illegal calls Plaintiffs received.To determine the identity of the individuals calling him illegally, and for no other reason, Plaintiff Abramson also played along during a call he received.

50.     Plaintiff Abramson initially interacted with an artificial intelligence and artificial voice system, but during one of the calls on October 15, 2024, and during one of the calls on October 28, 2024, Plaintiff was eventually transferred to the same live agent, Thomas Martinez, who was obviously human.

51.     Thomas, the human who answered, asked the Plaintiff for the mileage of his car, asked about the car's condition, and then proceeded to provide the Plaintiff pricing for HeadStart's services.

52.     For more than twenty years, the FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

53.     In 2008, the FCC likewise held that a company on whose behalf a telephone call is made bears the responsibility for any violations.

54.     The FCC has instructed that sellers such as HeadStart may not avoid liability by hiding behind third party agents and outsourcing telemarketing to third parties, such AIM:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment, limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because "sellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy."

*In re DISH Network, LLC*, 28 FCC Rcd. 6574, 6588 ¶ 37 (2013) (footnotes and alteration marks omitted).

55.     In 2013, the FCC held that a corporation or other entity that contracts out its telephone marketing "may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *Id.* at 6574 ¶ 1.

56.     HeadStart is liable for Defendant AIM's conduct and telemarketing calls placed by AIM and transferred to HeadStart and its agents to generate customers for HeadStart and its agents, including the Plaintiffs.

57.     Moreover, with full knowledge that AIM was violating the TCPA do not call registry provisions and prerecorded call provisions, HeadStart did nothing.

58.     HeadStart thus had full knowledge of AIM's illegal conduct and did not terminate or discipline them, thus implicitly ratifying their actions and endorsing their illegal behavior.

59.     The aforementioned facts also demonstrate that HeadStart failed to supervise AIM or enforce their compliance with applicable laws and regulations.

60.     HeadStart was interested in hiring a lead generator that could make phone calls to potential customers, vet potential clients using AI technology, and only send them the interested ones.

61.     To do so, HeadStart hired AIM to orchestrate an *en masse* telemarketing campaign to dial and screen telephone number that it directed.

62.     Indeed, HeadStart's relationship with Defendant AIM contains numerous hallmarks of agency which were memorialized in the Terms of Use agreement governing AIM's platform services.

63.     For example, HeadStart, who the agreement describes as a "Subscriber" seeking to use AIM AI's services for marketing purposes, hired AIM AI, who the agreement describes as a company providing telemarketing calling platform services "including programs, features, account portals, and technical support."

64.     The agreement provided that AIM AI would provide the AI-based prerecorded calling "tools for the Subscriber's responsible use" with the understanding that "it is the Subscriber's sole responsibility for such use."

65.     The Terms of Use explicitly placed compliance obligations on HeadStart as the Subscriber and required that "Subscriber agrees to comply with and abide by all applicable federal and state laws, rules, and regulations governing the use of automated or prerecorded/artificial calls or texts," including "the Telephone Consumer Protection Act, the Telemarketing Sales Rule and accompanying Do-Not-Call regulations."

66.     Moreover, the agreement required that "Subscriber shall provide accurate, correct, and truthful Caller ID information."

67.     The agreement also provided that "The Subscriber provides to AIM AI" subscriber data and granted AIM AI the right to use such data "for the limited purpose of fulfilling AIM AI's obligations under this Agreement." This demonstrates that AIM AI was acting to fulfill obligations to HeadStart of calling people HeadStart directed, not independently or to use the telephone numbers that HeadStart directed AIM to call for AIM's own purposes.

68.     In fact, AIM AI's terms of use make it incumbent on sellers like Headstart to upload "information, databases, or audio messages," which it agreed to allow AIM to "monitor."

69.     In other words, HeadStart, as Subscriber, uploaded the dialing lists of the number to be called, which AIM then called, at HeadStart's direction. This shows that HeadStart, as Subscriber and campaign sponsor, directed and controlled the core features of the calling, including who to call and how the calls would appear to consumers in the form of Caller ID, while AIM AI physically dialed the calls themselves and screened them using AI technology before transferring them to HeadStart.

70.     The agreement also required HeadStart to maintain all records to prove that the people it directed AIM to call had provided legally valid consent.

71.     Furthermore, HeadStart has admitted in discovery that "AIM, an independent contractor, coordinated the test marketing campaign for HWG," thereby admitting that AIM acted under HeadStart's direction in conducting the subject calling campaign.

72.     HeadStart also admitted that when "a consumer accepted the 'pitch' presented by AIM on behalf of HWG," further actions would be taken, explicitly acknowledging that AIM AI was acting "on behalf of" HeadStart.

73.     By providing the very telephone number data to be used, per the terms of AIM's terms of use, and directing AIM to act "on behalf of" HeadStart as HeadStart "tested telemarketing," HeadStart directed and controlled AIM and the content, method, and criteria of the communications that AIM placed.

74.     As such, HeadStart controlled the content of AIM's telemarketing, including by, according to the explicit terms of the agreement *providing AIM the telephone numbers it wanted AIM to call*.

75.     Finally, HeadStart could have terminated AIM.

76.     It did not.

77.     By virtue of identifying the leads that they would accept and directing the conduct and other indicia of the calls at issue described above, HeadStart directed AIM and the content, method, and criteria of the communications that AIM would use in their calling.

78.     A reasonable seller like HeadStart whose agents are making calls using prerecorded voices would investigate into the reasons why their agents and telemarketers would be calling cellular telephone numbers using highly-illegal prerecorded messages without consent that HeadStart did not have, despite providing AIM the numbers to call.

79.     It did not.

80.     As such, they knowingly ratified AIM's conduct.

81.     HeadStart also ratified AIM's conduct because, with knowledge that it was hiring AIM to place non-consensual pre-recorded calls, they accepted the Plaintiffs's lead and tried to sell the Plaintiffs a car warranty.

82.     HeadStart accepted the AI call transfer from AIM and then utilized it for a benefit by continuing to promote its services to Plaintiffs.

83.     The 2013 FCC ruling holds that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." *In re DISH Network*, 28 FCC Rcd. 6592-93 ¶ 46. Evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 ¶ 46.

84.     The aforementioned calls were placed using and beginning with a prerecorded voices because: (a) the robot's questions and speech were sometimes cut off and clunky, (b) the robot had an identical, generic, monotone voice, (c) it would be illogical for a human to call someone and play various scripted questions and statements without the ability to engage in dialogue, (d) the robot repeated the same identical phrases during the call multiple times exactly the same way, just like playing back a recording, and (e), the Plaintiffs were eventually transferred to human beings who were obviously human.

85.     Here, AIM is directly liable under the TCPA because it is the actual initiator of the subject calls themselves. HeadStart is vicariously liable for hiring

AIM to call the numbers it directed AIM to call, with prerecorded messages, on its behalf.

86.    The aforementioned calls to the Plaintiffs were unwanted.

87.    The calls were nonconsensual encounters.

88.    Plaintiffs' privacy have been violated by the above-described telemarketing calls.

89.    Plaintiffs never provided their consent or requested the calls.

90.    Plaintiffs and the other call recipients were harmed by these calls. They were temporarily deprived of legitimate use of their phones because the phone line was tied up, they were charged for the calls and their privacy was improperly invaded.

91.    Moreover, these calls injured Plaintiffs because they were frustrating, obnoxious, annoying, were a nuisance and disturbed the solitude of Plaintiffs and the class.

## Class Action Statement

92.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully stated herein.

93.     Plaintiffs bring this action on behalf of himself and the following

classes (the "Classes") pursuant to Federal Rule of Civil Procedure 23(b)(2) and/or

(b)(3).

94.     Plaintiffs propose the following Class definitions, subject to

amendment as appropriate:

**Robocall Class:** All persons in the United States who, (1) within four
years prior to the commencement of this litigation until the class is
certified (2) received one or more calls on their cellular telephone or any other
protected telephone service (3) from or on behalf of AIM AI LLC d/b/a
Safeguard My Car, LLC, or HeadStart Warranty Group LLC, (4) sent using
the same, or substantially similar, pre-recorded message used to contact the
Plaintiffs.

**National Do Not Call Registry Class:** All persons within the United States:
(1) whose residential telephone numbers were on the National Do Not Call Registry
for at least 31 days; (2) but who received more than one telephone solicitation call
from Defendants or a third party acting on Defendants' behalf; (3) within a 12-month
period; (4) within the four years prior to the filing of the Complaint.

95.     Plaintiffs are members of and will fairly and adequately represent and

protect the interests of the Classes as they have no interests that conflict with any

of the Class members.

96.     Excluded from the Classes are counsel, Defendants, and any entities

in which Defendants have a controlling interest, the Defendants' agents and

employees, any judge to whom this action is assigned, and any member of such

judge's staff and immediate family.

97.    Plaintiffs and all members of the Classes have been harmed by the acts of Defendants, including, but not limited to, the invasion of their privacy, annoyance, waste of time, the use of their telephone power and network bandwidth, and the intrusion on their telephones that occupied them from receiving legitimate communications.

98.    This Class Action Complaint seeks injunctive relief and money damages.

99.    The Classes as defined above, are identifiable through Defendants' dialer records, other phone records, and phone number databases.

100.    Plaintiffs do not know the exact number of members in the Classes, but Plaintiffs reasonably believe Class members number, at minimum, in the hundreds.

101.    The joinder of all Class members is impracticable due to the size and relatively modest value of each individual claim.

102.    Additionally, the disposition of the claims in a class action will provide substantial benefit to the parties and the Court in avoiding a multiplicity of identical suits.

103.    There are well defined, nearly identical, questions of law and fact affecting all parties. The questions of law and fact, referred to above, involving the class claims predominate over questions that may affect individual Class members.

104. There are numerous questions of law and fact common to Plaintiffs and to the proposed Classes, including, but not limited to, the following:

a. Whether Defendants made multiple calls to Plaintiffs and members of the National Do Not Call Registry Class;

b. Whether Defendants made calls using artificial or prerecorded voices to Plaintiffs and members of the Robocall Class;

c. The corresponding degrees and liability as among and between Defendants;

d. Whether Defendants' conduct constitutes a violation of the TCPA; and

e. Whether members of the Classes are entitled to treble damages based on the willfulness of Defendants' conduct.

105. Further, Plaintiffs will fairly and adequately represent and protect the interests of the Classes. Plaintiffs have no interests which are antagonistic to any member of the Classes.

106. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions, and especially TCPA class actions. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the other members of the Classes, and have the financial resources to do so.

107.   Common questions of law and fact predominate over questions affecting only individual Class members, and a class action is the superior method for fair and efficient adjudication of the controversy. The only individual question concerns identification of Class members, which will be ascertainable from records maintained by Defendants and/or their agents.

108.   The likelihood that individual members of the Classes will prosecute separate actions is remote due to the time and expense necessary to prosecute an individual case.

109.   Plaintiffs are not aware of any litigation concerning this controversy already commenced by others who meet the criteria for class membership described above.

## FIRST CAUSE OF ACTION

**Statutory Violations of the Telephone Consumer Protection Act (47 .S.C. § 227(b)) on behalf of the Robocall Class**

110.   Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

111.   The Defendants violated the TCPA by sending or causing to be sent calls to the cellular telephones and other protected telephones of Plaintiffs and members of the Robocall Class using a pre-recorded messages without their prior express written consent.

112.    As a result of Defendants' violations of 47 U.S.C. § 227 *et seq.*, Plaintiffs and Robocall Class members are entitled to an award of $500 in statutory damages for each and every violation of the statute, pursuant to 47 U.S.C. § 227(b)(3)(B).

113.    The Plaintiffs and Robocall Class members are entitled to an award of treble damages if the Defendants' actions are found to have been knowing or willful.

114.    Plaintiffs and Robocall Class members are also entitled to and do seek injunctive relief prohibiting Defendants from using a pre-recorded voice in the future, except for emergency purposes.

## SECOND CAUSE OF ACTION

**Violation of the Telephone Consumer Protection Act
(47 U.S.C. § 227(c)(5) & 47 C.F.R. § 64.1200(c) on behalf of Plaintiffs and the
National Do Not Call Registry Class)**

115.    Plaintiffs incorporate the allegations from all previous paragraphs as if fully set forth herein.

116.    The foregoing acts and omissions of Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf constitute numerous and multiple violations of the TCPA, 47 U.S.C. § 227. by making telemarketing calls, except for emergency purposes, to Plaintiffs and members of

the National Do Not Call Registry Class despite their numbers being on the National Do Not Call Registry.

117.    Defendants' violations were negligent, willful, or knowing.

118.    As a result of Defendants' and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf, violations of the TCPA, 47 U.S.C. § 227, Plaintiffs and members of the National Do Not Call Registry Class are entitled to an award of up to $500 and in damages for each and every call made and up to $1,500 in damages if the calls are found to be willful.

119.    Plaintiffs and the members of the National Do Not Call Registry Class are also entitled to and do seek injunctive relief prohibiting Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf from making telemarketing calls to telephone numbers registered on the National Do Not Call Registry, except for emergency purposes, in the future.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually and on behalf of the Classes, pray for the following relief:

A. Injunctive relief prohibiting Defendants from calling telephone numbers advertising their goods or services, except for emergency purposes, to any residential number on the National Do Not Call Registry in the future;

B. Injunctive relief prohibiting Defendants from using artificial or pre-recorded voices to contact cell phones and other protected lines, except for emergency purposes, in the future;

C. That the Court enter a judgment awarding Plaintiffs and all Class members statutory damages of $500 for each violation of the TCPA and $1,500 for each knowing or willful violation; and

D. An order certifying this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23, establishing Classes the Court deems appropriate, finding that Plaintiffs are proper representatives of the Classes, and appointing the lawyers and law firms representing Plaintiffs as counsel for the Classes;

E. Such other relief as the Court deems just and proper.


## **JURY DEMAND**

Plaintiffs requests a jury trial as to all claims of the complaint so triable.


Plaintiff,
By Counsel,


*/s/ Andrew Roman Perrong*
Andrew Roman Perrong, Esq.
M.D. Pa. Bar #333687
Perrong Law LLC
2657 Mount Carmel Avenue

Glenside, Pennsylvania 19038
Phone: 215-225-5529 (CALL-LAW)
Facsimile: 888-329-0305
a@perronglaw.com

*/s/ Anthony I. Paronich*
Anthony I. Paronich, *Pro Hac Vice*
Paronich Law, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
(508) 221-1510
anthony@paronichlaw.com